The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Greg Willis, the briefs on appeal and argument of counsel. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives or amend the Opinion and Award. Accordingly, the Opinion and Award by Deputy Commissioner Willis is affirmed.
* * * * * * * *
This case was heard, in part, before Deputy Commissioner Willis on 25 February 1993 in Charlotte. At the hearing, the parties submitted a Pre-Trial Agreement, dated 25 February 1993; and this document, with its stipulations, is incorporated by reference as though fully restated herein.
Following the hearing, the record remained open to allow the parties to produce additional evidence. Since that time, the parties have submitted the depositions of Dr. William Griffin, Dr. Joseph Estwanik, and Dr. William Lyday, and a series of medical records per a cover letter of plaintiff dated 8 August 1994. In addition to the evidence accepted at the hearing, these documents are hereby made a part of the record of this case; and all objections raised by counsel at the deposition are hereby OVERRULED, except for plaintiff's objection during Dr. Griffin's deposition beginning on Page 16, Line 15, and continuing through Page 18, Line 12, which are SUSTAINED.
Based upon the competent evidence of record, the undersigned makes the following additional:
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was 49 years old, having been born on 26 August 1943. Plaintiff left school in the seventh grade, at age 15, after having failed three grades. Plaintiff worked for two years as a bag boy in a supermarket, and he joined the Army at age 17. While in the Army, plaintiff earned his G.E.D. Plaintiff's duties in the Army were primarily in food service, but plaintiff worked for six years as a recruiter. In 1983 plaintiff retired from the Army after serving for 23 years. In 1984 plaintiff sold life insurance. Plaintiff became a truck driver in 1985 and started to work for defendant as a long-distance truck driver in 1987. His job duties with defendant included making deliveries to different stores and unloading merchandise.
2. With respect to medical history, plaintiff had prior injuries to his left knee and his back. On 10 June 1986 plaintiff injured his left knee, which resulted in surgery being performed in February 1989. In 1985 plaintiff injured his low back, and this incident did not result in any surgery being performed. Plaintiff returned to work in March 1986 after his 1985 back injury, and his doctors initially gave him a 10 to 15 percent permanent partial rating to his back. In October 1988 Dr. John Caughran, the physician of plaintiff's choice, expressed his opinion that plaintiff retained a 50 percent permanent partial impairment to his back and that plaintiff would never be able to return to work as a truck driver, although plaintiff had returned to work two years earlier and would continue to work as a truck driver for four years afterward. In February 1989 plaintiff underwent a second surgery to his left knee. On 27 October 1989 plaintiff sustained a second injury to his back. While out of work a few weeks after his second back injury, plaintiff suffered a heart attack.
3. On 21 April 1992 plaintiff was driving in West Virginia as part of a delivery from Charlotte to Ohio. A co-worker, Morris Stallings, was driving a truck in front of plaintiff, but not in sight. They were driving in a heavy rain; and as plaintiff was changing lanes, he lost control of his truck, causing it to run off the road and strike an embankment. Although plaintiff was wearing a seat belt, he was tossed about in the cab and sustained a large bruise on his right side, at his belt line. Plaintiff did not sustain a bruise to either knee. Plaintiff would testify that during the wreck he was rather wildly tossed about in the cab and struck in the head with flying debris; however, the Full Commission does not accept this testimony as credible based on the very limited amount of bruising which plaintiff received in the wreck and his initial reports of no injury.
4. Following this incident, the police arrived; and plaintiff used his radio to contact Mr. Stallings. Plaintiff told the police that he was not injured. Plaintiff rode with Mr. Stallings from West Virginia back to Charlotte (five hours); and during this time, plaintiff did not report any injury to Mr. Stallings. When plaintiff arrived at defendant's terminal in Charlotte, plaintiff told the dispatcher that he did not require any medical attention. During a statement to defendant-insurance carrier's adjuster plaintiff told the adjuster that he did not need any medical attention after the incident.
5. On the night of the incident, plaintiff was suspended from the defendant's employment and was told that he would probably be terminated. The next day plaintiff returned to the terminal to prepare a written report. At this time plaintiff told the dispatcher that he had hurt his back, but did not report any injury to his knee. Defendant prepared an Accident Report and referred plaintiff to Presbyterian Care Plus. At this examination, plaintiff reported that he had injured his back in a motor vehicle accident, but he did not report any injuries to his knees.
6. Shortly after the incident on 21 April 1992, plaintiff and a co-worker, Marion Cope, drove from Charlotte to West Virginia to take pictures of plaintiff's truck. At the time of the hearing, Mr. Cope was also out of work and also had a pending workers' compensation claim against defendant. Mr. Cope was with plaintiff a large amount of time after the incident, and Mr. Cope did not overhear plaintiff tell anyone that he (plaintiff) was going to use workers' compensation for all it was worth.
7. On or about 6 May 1992 defendant completed its investigation of the incident and was of the opinion that the single-vehicle wreck was plaintiff's fault. This was not plaintiff's first wreck in a tractor trailer. Defendant terminated plaintiff's employment. Plaintiff was offered the opportunity to resign, and plaintiff resigned.
8. Shortly after the incident, plaintiff talked to Rusty Harned, a co-worker who had known plaintiff outside of work and had not had any cross words with plaintiff. Mr. Harned knew of the incident in West Virginia. Mr. Harned asked plaintiff how badly he had been hurt, and plaintiff told Mr. Harned that he had hurt his knee and that he was going to play workers' compensation as far as he could play it. At this time plaintiff had been asked to resign from defendant. Plaintiff told Mr. Harned that he had received three job offers.
9. After the incident of 21 April 1992, plaintiff returned to Dr. Joseph Estwanik, the orthopedic surgeon, who had done the prior surgeries on plaintiff's left knee. Dr. Estwanik scheduled arthroscopic surgery for plaintiff's right knee to be performed on 20 May 1992. Before the surgery defendant referred plaintiff to Dr. Kenneth Bergmann, a neurologist. At the time of Dr. Bergmann's examination, plaintiff's complaints of pain were in a nonphysiologic distribution, but Dr. Bergmann was concerned at a loss of reflexes. Dr. Bergmann ordered a CT scan. At the time of the CT scan, there was very mild left facet disease at spinal level L4-5. Dr. Bergmann recommended that plaintiff undergo physical therapy before any surgery was performed. The May 1992 surgery was canceled, and plaintiff underwent a course of physical therapy.
10. Plaintiff made progress through physical therapy, but Dr. Estwanik rescheduled a surgery for 7 July 1992. At the time of the surgery, plaintiff had third or fourth degree arthritis of the right knee. This condition preexisted the incident of 21 April 1992. On 16 October 1992 Dr. Estwanik released plaintiff to return to work with restrictions of no repetitive climbing or squatting. Plaintiff continued with physical therapy through December 1992.
11. On 15 January 1993 plaintiff was referred by Dr. Bergmann to the Pain Therapy Center of Charlotte for a consultation. Dr. Daniel Hamaty and Brian Simpson, a Ph.D., recommended a course of Work Hardening. Rather than follow this treatment, plaintiff's attorney referred him to Dr. William Lyday, a thoracic and general surgeon. After several examinations, it was Dr. Lyday's opinion that plaintiff suffered from bilateral thoracic outlet syndrome, greater on the right; reflex sympathetic dystrophy of both arms, greater on the right, cervical and lumbar spondylosis; esophagitis and gastritis, hiatal hernia; and hypothyroidism. Dr. Lyday was also concerned that plaintiff might suffer from bilateral carpal tunnel syndrome.
12. On 14 April 1993 plaintiff was examined by Dr. William Griffin, an orthopedic surgeon. During Dr. Griffin's examination, plaintiff's straight leg raising test was positive while lying down, but was negative when performed in a seated position. Plaintiff magnified his symptoms to Dr. Griffin. Dr. Griffin did not recommend any treatment and made no return appointment. Dr. Griffin did not agree with Dr. Lyday's numerous diagnoses.
13. The Full Commission finds plaintiff's testimony was not credible. This finding is based on the following:
 a. Plaintiff's demeanor as he testified was not consistent with his claim of impairment. Plaintiff testified that he could sit for 45 to 60 minutes before his back would become stiff. Plaintiff testified for two hours and 50 minutes. Plaintiff did not take any medication before his testimony and was not wearing a TENS unit. Plaintiff was not taking any medication for his pain at the time of the hearing; although he claimed severe impairment, such as the weight of his arm hanging down caused his side to hurt.
 b. Plaintiff made statements that he intended to misuse workers' compensation.
 c. There is limited objective evidence to support plaintiff's claim. Although some objective findings support plaintiff's claim, such as the result of a nerve conduction studies; there is greater objective evidence to refute plaintiff's claim, such as the results of a CT scan, the findings of symptom magnification, and inconsistent results during his physical examination. Also no bruises were on plaintiff's knee immediately after the incident of 21 April 1992, indicating that he did not hit his knee with any significant force; and in his initial written reports, plaintiff made no statements of an injury to his knees.
14. The incident of 21 April 1992 was an interruption of plaintiff's regular work routine by unusual circumstances likely to result in unexpected consequences. However, the incident did not cause any of the problems which plaintiff has claimed for his knees, his legs, his arms, his back, his neck, or his head. Any conditions which were present in these multiple areas of plaintiff's body were pre-existing conditions; and based on plaintiff's initial reports, the incident of 21 April 1992 did not materially exacerbate those symptoms. Although plaintiff's physicians have generally found that the incident did exacerbate pre-existing conditions, these findings by the physicians are based entirely on plaintiff's subjective statements that his problems began immediately after the incident; and as plaintiff's subjective statements are not credible, the undersigned finds limited weight in the physicians' opinions to the extent that they relied on plaintiff's personal statements regarding his medical history.
15. Since 21 April 1992, plaintiff has not made a serious effort to obtain any gainful employment. Any inability of plaintiff to be gainfully employed since 21 April 1992 was not caused by the incident of 21 April 1992.
The foregoing stipulations and findings of fact engender the following:
CONCLUSIONS OF LAW
1. On 21 April 1992 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. N.C.G.S. § 97-2 (6).
2. As a result of the injury by accident of 21 April 1992, plaintiff was not disabled for any period of time. N.C.G.S. § 97-2 (a).
The foregoing stipulations, findings of fact and conclusions of law engender the following:
AWARD
1. Plaintiff's claim for compensation pursuant to the North Carolina Workers' Compensation Act must be, and the same is hereby, DENIED.
2. Each side shall pay its own costs, except that defendants shall pay an expert witness fee as provided by a previous Order, and an expert witness fee in the amount of $460.00 to Dr. William Lyday and $400.00 to Dr. William Griffin.
 S/ ___________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _______________________ DIANNE C. SELLERS COMMISSIONER